# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| IVY MOSES, KALEEN MOSES, KARRIS MOSES, AND MELANIE MOSES, | ) ) ) |
| Plaintiffs, | ) ) ) ) Case No. 3:22-cv-0063 |
| v. | ) ) ) |
| JEROME LAKE, | ) ) |
| Defendant. | ) ) |

**ATTORNEYS:**

**CRAIG M. O'SHEA, ESQ.**
DUDLEY NEWMAN FEURZEIG LLP
ST THOMAS, U.S. VIRGIN ISLANDS
   *FOR PLAINTIFFS IVY MOSES, KALEEN MOSES, KARRIS MOSES, AND MELANIE MOSES*

**RONALD W. BELFON, ESQ.**
RONALD W. BELFON, P.C.
ST THOMAS, U.S. VIRGIN ISLANDS
   *FOR DEFENDANT JEROME LAKE*

## MEMORANDUM OPINION

**MOLLOY, Chief Judge.**

**BEFORE THE COURT** is the Plaintiffs' Motion for Preliminary Injunction. (ECF No. 2.) The Court held a hearing on April 19, 2023. The parties filed their supplemental briefs on April 28, 2023 (ECF Nos. 34, 35) and responses to supplemental briefs on May 1, 2023 (ECF Nos. 37, 38). For the following reasons, the Court will deny the motion.

### I. BACKGROUND

On October 21, 2022, Plaintiffs Ivy Moses, Kaleen Moses, Karris Moses and Melanie Moses[1] filed a Verified Complaint asserting causes of action to quiet title, for adverse possession and conversion and Motion for Temporary Restraining Order and Preliminary Injunction. Plaintiffs' request for a temporary restraining order was denied. However, the

---

[1] Because the parties share the same last name and for the ease of reference, the Court will refer to individual Plaintiffs and their family members by their first names.

parties agreed to a Consent Order, which was issued on November 22, 2023, that directed Defendant Jerome Lake ("Lake") and his agents to refrain from entering, altering or otherwise asserting control over, or excluding Plaintiffs from the portion of the property enclosed by the fence as of October 1, 2022.

Plaintiffs filed the First Amended Verified Complaint on December 21, 2022, alleging causes of action to quiet title, for adverse possession and conversion and, alternatively, self-help ejectment. Plaintiffs asserted that, on February 10, 2000, Parcel No. 22-G Estate Enighed, St. John, U.S. Virgin Islands ("the Moses Property") owned by Plaintiffs' grandfather, Halvor Neptune Richards ("Neptune"[2]), was granted to Plaintiffs' father Iva A. Moses ("Iva") by Administrator's deed. On March 25, 2010, Iva granted the Moses Property to Plaintiffs by a Deed of Gift, retaining a life estate in the Moses Property where he lived continuously with his wife and Plaintiffs' mother Clemmie Moses ("Clemmie") until he passed away in 2018. Plaintiffs alleged that they continuously occupied the Moses Property until 2018, when they moved to Georgia. Since 2018, Plaintiffs asserted that they visited the Moses Property several times per year while Clemmie continued to occupy it, except for regular travels to Georgia for medical treatment.

Plaintiffs alleged that, in October 2022, Lake, who purchased Parcel No. 22-I Estate Enighed, St. John, U.S. Virgin Islands ("the Lake Property"), in 2015, surveyed it and asserted for the first time that the fence surrounding the Moses Property for more than 25 years, encroaches on the Lake Property. Plaintiffs asserted that Lake and his agents began excavating the Lake Property, destroyed the fence enclosing the Moses Property, and excluded Plaintiffs from the disputed portion of land. At the time of the destruction of the fence, the Moses family had possessed and used continuously the strip of land allegedly belonging to Lake Property enclosed by the fence for more than 30 years.

At the hearing, Melanie, Ivy, Clemmie, their neighbor Bodicea Gordon ("Gordon") and Lake testified. Plaintiffs' Exhibits 1-13 and 15, and Lake's Exhibits A, B and C were admitted in evidence.

---

[2] The Court will refer to this person by his middle name because that is how Plaintiffs refer to him.

Testimony of Melanie Moses

Melanie testified that Plaintiffs own the Moses Property on which Clemmie lives with their permission, and that the Moses Property has been enclosed by the fence, as long as she remembers, since the late 1980s or early 1990s. Melanie lived on the Moses Property since late 1980s and stopped living in the house when she went to college around 1990, 1991. She testified that initially she visited at least once a year but now she visits the Moses Property six times per year and stays between three weeks and one month and a half, and her son visits in the summer. Melanie's sister, Karris, visits the property at the same time as Melanie and Kaleen visits about three times per year. The sisters' visits are staggered.

Melanie further testified that the family moved to St. John in the late 1970s and lived in the country until her great grandfather, Neptune, offered her father, Iva, property to build a home in exchange for helping take care of him because he was ill. Iva purchased 22-G Estate Enighed from Neptune in 2000, as indicated in the Administrator's Deed. When questioned on cross-examination about the 2000 purchase-money mortgage Iva and co-borrower Sylvia B. Weaver ("Weaver") took to acquire 22-G Estate Enighed, Melanie stated that she knows there was a mortgage to purchase 22-G Estate Enighed but does not know the specifics since she was a child.[3] She testified that the mortgage was paid off and released to Plaintiffs once Iva passed away. Melanie acknowledged that the Administrator's Deed by which Iva purchased 22-G Estate Enighed and the mortgage taken by Iva and Weaver were recorded on the same date, September 11, 2000.

Melanie testified that she marked the yellow line on the map depicted in Plaintiffs' Exhibit 4, indicating that the disputed strip of property is located between the yellow line and the first diagonal line with marking 138.28. She testified that the family grew fruits and vegetable on the land inside the fence for personal consumption and occasional sales and give aways, although no vegetables are grown there now. Melanie stated that nobody has ever objected to their use of the Moses Property within the existing fence, until Lake objected in 2022. Before Lake, the Lake Property was owned by Melanie's uncle, Alford Richards. The

---

[3] Melanie's testimony that she does not know the specifics of the mortgage since she was a child in 2000 is inconsistent with her testimony that she went to college around 1990, 1991.

Moses family house sits on top of the hill and no other property has the same view as the view from the Plaintiffs' house.

### Testimony of Clemmie Moses

Clemmie testified that Iva is her ex-husband who was deeded 22-G Estate Enighed in 2000. In 1988, she moved into the house on the Moses Property that Iva paid to be built in the early 1980s. The barbed wire fence was there when she moved into the house but was later changed to a regular fence because her children were small, and they had dogs. The fence had to be fixed and replaced several times due to hurricanes, including the last time when part of the fence had to be replaced from the damage caused by Hurricanes Irma and Maria in 2017. Clemmie stated that in the past she had a garden where she grew vegetables, which she cannot do any longer due to her age and medical condition. She planted a mango tree from St. Croix that is still on the property of which she is proud, as well as other fruits. If she had to replace the mango tree she planted, she could get another tree from St. Croix. Clemmie believed the family owned the entire area surrounded by the fence and nobody ever objected to their use of the property. Clemmie testified that she would never take anybody's property knowingly.

### Testimony of Bodicea Gordon

Gordon testified that she has known Plaintiffs since they came to St. John in the 1980s or 1970s and is familiar with their property, of which she is a caretaker when the family is not home. She stated that the Moses Property has been fenced as long as she can remember, and the family used the enclosed land which contains fruit trees, including the mango tree that has been there a long time.

### Testimony of Ivy Moses

Ivy testified that the fence was on the property when she was a child. The family maintained the landscape, made improvements to the home and the area, grew fruit trees and plants, paid taxes, insurance, and anything that needed to be done on the property. Ivy lived on the Moses Property until 2018, when she moved to Georgia to do her residency at Emory Hospital. Ivy spent eight years in Atlanta for educational purposes between 1992 and 2000. She lives in Georgia and visits during the summer and for business purposes as she is

a registered nurse, and her two sons also visit. She testified that the family had banana trees and fig trees by the septic tank which is about 20 feet from the Lake Property where the fence was cut off. She stated that what makes the family property unique is "the history, the heritage, the fact that it was passed on from my great grandfather . . . as family property."

Ivy described the photograph of herself taken in 2006 or 2008 when she was pregnant, depicting the fence in the background that still stands and faces the northwestern part of the property. Before that photograph was taken, Ivy used to plant banana peppers, tomatoes, and okra. She testified that within the disputed portion of land the family had an above-ground swimming pool for three years, a trampoline for two years, a portable basketball rim which "goes and comes," some refrigerators that were used for the seedlings, and the family also used that area to assist with parking of the vehicles, and the kids used to play there.

Testimony of Jerome Lake

Lake testified that he purchased his property, 1.1 acre, from Alford Richards, who showed him the 2015 survey of the property which did not contain any notation regarding any fence or encroachment of any sort. Lake stated that he conducted a survey in October 2022, which did not alert him to anything that would cause him to take any action. However, when he received his plans "from DPNR"[4] and started to cut the land so he could build the house and the fence, a new chain-linked fence different from the old fence that surrounds the Lake Property was discovered inside the bounds of his property. Lake testified that the fence Plaintiffs alleged belongs to them encroaches into his property "almost a quarter acre," about 150 feet long and 40-50 feet wide. He stated that the mango tree about which Plaintiffs testified and the tamarind tree right under Plaintiffs' house are not on his property. Lake testified that the Court Order stopping him from proceeding to develop his property slowed down his development because he invested money into the project and had to put everything on hold. Lake plans to build four houses on the Lake Property.

---

[4] The Virgin Islands Department of Planning and Natural Resources.

## II. LEGAL STANDARD

To obtain a preliminary injunction, a movant must show that: (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of preliminary injunction; (3) the balance of equities favors her; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). The court may exercise its discretion to determine whether all four factors considered together warrant granting preliminary relief only after the movant establishes the first two "gateway factors." *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.,* 39 F.4th 95, 103 (3d Cir. 2022).

To show a likelihood of success, the movant must demonstrate that her chances of proving each of the elements of the claim are "significantly better than negligible.'" *Mallet & Co. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021) (citation omitted). To show irreparable harm, the movant must demonstrate potential harm which cannot be remedied by a legal or an equitable remedy after a trial, which means that the preliminary injunction is the only way to protect the movant from harm. *Siemens USA Holdings Inc v. Geisenberger*, 17 F.4th 393, 408 (3d Cir. 2021). However, a risk of harm is not sufficient, and the movant must make a clear showing of immediate irreparable harm. *ECRI v. McGraw-Hill, Inc.,* 809 F.2d 223, 226 (3d Cir. 1987). The required immediate irreparable harm must exist at the time the preliminary injunction is issued. *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1264 (3d Cir. 1985). The availability of adequate monetary damages negates a claim of irreparable injury. *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988).

## III. DISCUSSION

Plaintiffs concede that damages for conversion are quantifiable and seek preliminary injunction based on their adverse possession claim. They contend that the Moses Family has occupied the Moses Property, as demarcated by the surrounding fence, since the late 1980s, making regular, exclusive, and uninterrupted use of the fenced-in land for gardening, food harvesting, storage and family gatherings. Plaintiffs argue that the harm is clear and imminent because Defendant has already knocked down the fence and is poised to begin

excavating the disputed portion of land. According to Plaintiffs, the fruit trees, and plants on the disputed portion of land cannot be remedied monetarily.

Defendant argues that Plaintiffs cannot show likelihood of success on the merits because the activities that occurred on the disputed portion of land do not amount to hostile possession, and they did not know that the disputed portion of land belonged to the neighboring property. According to Defendant, Plaintiffs failed to establish that the alleged trees in the area are so unique and valuable that money cannot compensate and granting preliminary injunction will result in a greater harm to Defendant who has been attempting to prepare the land for development.

### A. Likelihood of Success on the Merits

The elements for a claim for adverse possession is set out in Title 28, Section 11 of the Virgin Islands Code, which provides: "The uninterrupted, exclusive, actual, physical adverse, continuous, notorious possession of real property under claim or color of title for 15 years or more shall be conclusively presumed to give title thereto." 28 V.I.C. § 11. The plaintiff must establish each element of her adverse possession claim by clear and convincing evidence. *Mahabir v. Heirs of George*, 63 V.I. 651, 659 (2015). To be exclusive, a possession needs to be characteristic of an owner's use. *Burnett v. Benjamin*, 44 V.I. 170, 179 (Terr. V.I. 2002). Actual possession means broadly dominion over the land and does not correspond to occupancy. *Sasso v. Hackett*, 45 V.I. 375, 381 (Terr. V.I. 2004). Erecting buildings or improving the land is not always necessary to prove actual, hostile possession. *Simpson v. Golden Resorts, LLLP*, 56 V.I. 597, 607 (2012). A possession is hostile "when one does such acts on land 'as ordinarily only an owner would do.'" *Tutein v. Daniels*, 10 V.I. 255, 261 (D.V.I. 1973). Determining whether possession is hostile is not based on a formula. *McNamara v. Christian*, 26 V.I. 109, 112 (Terr. V.I. 1991). An adverse claimant's possession "must not only be without subserviency to, or recognition of, the title of the true owner, but it must be hostile to the whole world." *Netsky v. Sewer*, 205 F.Supp. 2d. 443, 460 (D.V.I. 2002). Continuous use does not mean continuously staying on land or performing acts as owners would perform daily. *Burnett v. Benjamin*, 44 V.I. 170, 179 (Terr. V.I. 2002). To establish the open and notorious requirement, "the possession must be unconcealed and 'so conspicuous that it is generally

known by the public or by people in the neighborhood.'" *Id.* at 176–77 (quoting *Griles v. Griles*, 39 V.I. 135, 137 (Terr. V.I. 1998)).

### *(1) Scope of the Adverse Possession Claim*

At the outset, it is important to note two important conveyances in this matter: (1) Neptune Estate's 2000 Administrator's Deed (Pls.' Ex. 2); and (2) Iva's 2010 Deed of Gift of 22-G Estate Enighed to Plaintiffs (Pls.' Ex. 1). Neptune Estate's 2000 Administrator's Deed conveying to Iva 22-G Estate Enighed for $275,000 and Iva's 2010 Deed of Gift of 22-G Estate Enighed to Plaintiffs as tenants in common – subject to Iva's life estate and his retaining possession and control of all the real property with the remainder in fee simple absolute to vest in Plaintiffs on his death – are both based on the description of the property in OLG Map No. D9-6689-T99, (Pl.'s Ex. 3, 4), which does not include the disputed portion of land as outlined by Melanie with a yellow marker on the map appearing to be part of OLG Map No. D9-6689-T99. Thus, any claim of adverse possession of 22-G Estate Enighed as described in OLG Map No. D9-6689-T99 is precluded by Iva's purchasing of that property in 2000 and deeding the same to Plaintiffs subject to Iva's life estate in 2010. *See DeCastro v. Stuart*, 45 V.I. 591, 602 (D.V.I. 2004) (holding that DeCastro did not obtain title to the property through adverse possession because he "obtained equitable title to the property by entering into a contractual agreement to purchase it and partially performing under that contract."). Thus, the Court finds, and the parties concede, that the adverse possession claim is limited to the disputed portion of land on 22-G Estate Enighed.

### *(2) Plaintiffs' Possession*

Plaintiffs concede that they "have not owned the Moses Property for the statutory period of fifteen years," but assert that "the Moses Family possessed and occupied the Moses Property continually and without interruption from the late 1980s until the present day, and the continuous possession of the various Moses family members was maintained by mutual consent," (ECF No. 3 at 9), and "the Moses Family demonstrated ownership of the land enclosed by their fence by routinely making improvements and regularly using the land for typical domestic purposes such as gardening, food harvesting, storage, and family gatherings" (*Id.* at 10-11.) Plaintiffs assert that *Emanuel v. A Section of Parcel 119 & 121 Est.*

*Smith Bay*, 21 V.I. 92 (D.V.I. 1984) is directly on point, because as in that case, "the Moses family with Plaintiffs' assistance, has grown and harvested fruits and vegetables," (ECF No. 38 at 13), "the Moses family erected and maintained a fence enclosing the disputed property," (*Id.* at 14), and "the Moses family brought in a machine to shape the land to better suit their intended uses". (*Id.*).

The doctrine of tacking allows an adverse claimant to add her period of possession to that of a previous adverse possessor for the purpose of establishing continuous possession during the required statutory period. *Powell v. Mahabir*, 50 V.I. 890, 895 (D.V.I. 2008). However, successive possessions cannot be tacked if there is no privity of estate or a connection between the successive occupants. *Id.* Tacking an adverse possessor's possession to her predecessor's adverse possession requires the claimant to receive possession from the predecessor "by some act of such other or by operation of law.'" *Hendricks v. Clyne*, No. ST-16-CV-147, 2016 WL 6427879, at *3 (V.I. Super. Ct. Oct. 28, 2016) (citation omitted). "The acts required to accomplish adverse possession will, of course, vary depending upon the nature of the property itself and the uses to which it is adaptable." *Simpson*, 56 V.I. at 606–07. For example, "[a] barren tract of land might be reduced to possession, hostile to the ownership of the record titleholder, by merely erecting a fence." *Id.*

Plaintiffs do not identify any specific period with respect to which they, not "the Moses Family," claim adverse possession of the disputed portion of land. Before Plaintiffs can avail themselves of the tacking doctrine, Plaintiffs first must establish that they, not "the Moses Family," are adverse possessors. In *Emanuel*, the court found as follows:

> Since sometime prior to the year 1942 when this plaintiff was 16 years of age, his father who is the owner of record according to recent surveys of a parcel adjoining Parcels 119 and 121, was utilizing the particular portions of land which are the subject of this dispute. Plaintiff's father, with plaintiff's assistance, planted provisions on the land, grazed his animals on the land and in connection with the farming activities had built terraces on the land, the better to facilitate the provisions he was planting. Plaintiff, together with his father, planted fruit trees on the land some of which remain, together with the terraces, to this very day. In 1942, plaintiff and his father erected a fence enclosing the disputed piece of property, at least on three sides. Upon the death of plaintiff's father in 1954, plaintiff continued to maintain the fencing and to plant provisions on the property as well as to graze animals. All during

>  that time plaintiff and his father occupied and used the premises under claim
> or color of ownership.

*Emanuel*, 21 V.I. at 94. However, unlike in *Emanuel*, there is no evidence that Iva, the owner of record of the Moses Property as of September 2000, when the Administrator's Deed was recorded, was utilizing the disputed portion of land in any manner at any time between 2000 and 2018. There is also no evidence that Iva planted and harvested fruits and vegetables on the disputed portion of land with assistance of Plaintiffs or that he erected and maintained the fence enclosing the disputed property, that Iva brought in a machine to shape the land. Moreover, there is no evidence that Iva occupied and used in any way the disputed portion of land. Conclusory assertions that "the Moses Family" performed certain acts necessary to establish adverse possession, one of which with Plaintiffs' assistance, is not sufficient to satisfy the elements of Plaintiffs' adverse possession claim.

Moreover, when Iva deeded 22-G Estate Enighed to Plaintiffs in 2010, he retained a life estate and conveyed future interest to Plaintiffs, namely, remainder in fee simple absolute effective on his death in 2018. In the 2010 deed, Iva explicitly retained possession and control of the entire property and all rents and profits derived from it. *See Pickering v. Emanuel*, No. ST-09-CV-434, 2010 WL 11718587, at *1 (V.I. Super. Ct. Nov. 10, 2010) (finding that, "as the owner of a life estate, Plaintiff was entitled to the undisturbed possession of the property for the duration of his life and was privileged to receive all profits derived from the property during this time"). Iva passed away in 2018, and that is when Plaintiffs' remainder in fee simple absolute interest vested. Plaintiffs' remainder interest in a fee simple absolute to 22-G Estate Enighed between 2010 and 2018 was subject to Iva's possessory interest in his life estate as provided in the 2010 deed. Plaintiffs do not claim any possessory interest between 2010 and 2018 adverse to Iva's possessory interest since they argue that Iva was an adverse possessor and seek to tack their possession of the disputed portion of land to Iva's. *See Alvarez v. Est. of Keel*, 73 V.I. 538, 2020 VI 15, ¶ 15 (2020) (finding that "[p]ossession also cannot be adverse if the possessor recognizes a superior ownership interest in the property, as possession under those circumstances is not hostile to the owner's interest"); *Netsky*, 205 F. Supp. 2d at 460 (finding that "[p]ossession of real property by an adverse claimant must not only be without subserviency to, or recognition of, the title of the true

owner, but it must be hostile to the whole world"). Thus, Plaintiffs could not have been adverse possessors over the disputed portion of land from 2010 to 2018, because during that period Iva held a life estate and retained possession and control of the property. Plaintiffs testified that, since 2018, they reside in Georgia and visit the Moses Property, although their mother, Clemmie, lives there with their permission. However, despite testimony that Plaintiffs visit the Moses Property, there is no evidence of any fruit and vegetables planting and harvesting on the disputed portion of land between 2018 and 2022, when the complaint was filed, or any specific use of the disputed portion of land as only an owner would do within that specific timeframe. In the absence of any evidence establishing that Plaintiffs used the disputed portion of land as only an owner would do from 2018 to 2022, the Court is not convinced that Plaintiffs' chance of establishing adverse possession of the disputed portion of land is significantly better than negligible. *Mallet*, 16 F.4th at 380. Even assuming that Plaintiffs' chances of establishing they are adverse possessors are significantly better than negligible, Plaintiffs would need to establish that tacking to Iva, the previous adverse possessor, is warranted.

### *(3) Iva's Possession*

Plaintiffs argue that their "possession tacks onto the previous possessor, their father," because he "constructed the fence surrounding the Moses Property and resided there continuously from the late 1980s until his death in 2018." (ECF No. 3 at 9.)

Plaintiff's assertion in their memorandum of law that their father Iva constructed the fence surrounding the Moses Property is not supported by any testimony or documentary evidence or even alleged in the Verified Complaint and the First Amended Verified Complaint, which only allege that "[t]he Moses Property has been fenced since the late 1980s," (ECF No. 1 ¶ 10, ECF No. 21 ¶ 10), not who constructed the fence or when it was constructed. None of the witnesses knew who erected the fence or when it was erected. Clemmie testified that when she moved to the house on the Moses Property in 1988, the fence was already there, which supports the argument that the Moses Property was fenced since 1988, but not that Iva constructed the fence or when it was constructed.

The existence of the fence alone, in 1988 or prior to 1988, without evidence that Iva erected it, is insufficient for the purpose of establishing Iva's adverse possession of the disputed portion of land. This is so because prior to 2000, Neptune owned the entire 22 Estate Enighed, including 22-G Estate Enighed and the disputed portion of land. Neptune may have erected a fence or fences within his property for any reason. Neptune, of course, could not adversely possess his own land.

Ivy testified that Neptune "was one of the largest landowners in St. John, (ECF No. 36 at 104), "[t]he Richards was the family that was known for farming so that's what we did, was farmed. We were the ones that had the animals," (*Id.* at 104-105), "this fence, the fence that we have there was also used to fence in the animals back in the day," and the property "was farmland before we moved there and it continued being somewhat farmland, just not for animals but for fruits and stuff like that, for plants." (*Id.* at 93-94.) Since none of the witnesses testified that they had ever had farm animals, Ivy's testimony about the Richards family history of raising farm animals suggests that the fence may have existed on Neptune's property for a significant amount of time prior to 1988. The existence of the fence on Neptune's property for some time prior to the Moses family moving there in 1988, would be consistent with Neptune's use of his property as a farmland and to keep the animals out of certain parts of the property, as testified by Ivy. Thus, in the absence of any evidence establishing that Iva erected the fence demarcating the disputed portion of land, the Court is not convinced that Plaintiffs' chance of establishing that adverse possession of the disputed portion of land commenced by Iva's erecting the fence is significantly better than negligible. *Mallet*, 16 F.4th at 380.

Plaintiffs also allege that Iva acquired adverse possession of the disputed portion of land by residing on the Moses Property continuously from the late 1980s until his death in 2018. However, no evidence supports the allegation of Iva's continuing residence on the Moses Property from late 1980s until his death in 2018. None of the witnesses testified about Iva specifically, apart from why he came to the island and that he purchased 22-G Estate Enighed from Neptune' Estate Administrator and mortgaged the property with Weaver in 2000. There is no testimony or any documents evidencing Iva's alleged residency on the

Moses Property at any time from 1988 to 2018, or any acts performed by him on the Moses Property in general and the disputed portion of land in particular, such as any improvements that he undertook or activities in which he engaged during that period of thirty years, including planting, harvesting, repairing or replacing the fence, playing with children or other family members or entertaining guests. *Cake Box Bakery, Inc. v. Maduro*, 15 V.I. 283, 289 (Terr. V.I. 1978) (opining that an adverse claimant "must intend to hold the land for himself, and that intention must be made manifest by his acts. It is the intention that guides the entry and fixes its character."). The March 30, 2010 Real Property Tax Clearance Letter indicating that there are no outstanding real property tax obligations since 2005 for 22-G Estate Enighed is not evidence that Iva paid taxes on the disputed portion of land. *Id.* at 290 (explaining that, although "payment of taxes is not a condition to acquisition of title by adverse possession" in the Virgin Islands because it is not made so by statute, "such payment strengthens the claimant's position); *see Alvarez*, 2020 VI 15, ¶¶ 11, 20 (finding that "Alvarez's failure to pay rent for nearly 17 years, while maintaining continuous possession, together with his other actions with respect to the property," including giving "constructive notice to the title holder by making improvements and repairs and by paying property taxes assessed on the property from 1996 onward," were more than sufficient to provide constructive notice of his hostile intent.").

Plaintiff's allegation in the Verified Complaint and the Amended Verified Complaint that Iva "continued to occupy the property continuously with his wife, Clemmie Moses, until Iva A. Moses passed away in 2018," (ECF No. 1 ¶ 17, ECF No. 21 ¶ 17), is belied by Clemmie's testimony that Iva was her ex-husband, not her late husband, which means that Clemmie and Iva divorced before Iva passed away in 2018. Although Plaintiffs and Clemmie used "we" to refer to their family during testimony, not once did any of them specifically identify Iva in connection with anything about which they testified, except that he purchased the property by taking the mortgage with Weaver in 2000. For example, Clemmie testified that "we moved in in 1988," (ECF No. 36 at 54), "[w]e moved to the address where we are now in 1988," (*Id.* at 51), and "when I use 'we,' I'm talking about the family, my family," without mentioning Iva. Melanie testified that "we moved to 22-G in, like I mentioned, the late '80," (*Id.* at 15), without

mentioning Iva. Ivy testified that "[w]e made lots of improvements since we moved up there," "[w]e maintained the land," "[w]e have made improvements to the home," "[w]e pay land tax," "[w]e pay insurance," and "[a]nything that needs to be done on that property, we pay for it," (*Id.* at 93-94), without mentioning Iva. Where, as here, Plaintiffs seek to tack their adverse possession to that of Iva, they must establish that Iva was a prior adverse possessor. *Hendricks*, 2016 WL 6427879, at *3 (explaining that "[t]he principle of tacking 'is one that permits an adverse possessor to add his or her period of possession to that of a prior adverse possessor to establish continuous possession for the required statutory period[,] ... provided the other elements of adverse possession are also present during' all periods of possession.") (citation omitted). In the absence of evidence that Iva resided on the Moses Property continuously from late 1980s to his death in 2018, or that during that time he had dominion over the disputed portion of land by personally acting in connection with the disputed portion of land "as ordinarily only an owner would do," *Tutein*, 10 V.I. at 261, the Court is not convinced that Plaintiffs' chance of establishing Iva's adverse possession of the disputed portion of land by Iva's continuing residence from 1980s to 2018 are significantly better than negligible. *Mallet*, 16 F.4th at 380.

Iva's acquiring of title to 22-G Estate Enighed alone is not sufficient to establish adverse possession of the disputed portion of land because the bounds and meets of the acquired property as described in OLG Map No. D9-6689-T99 in the Administrator's Deed to Iva, which is the same property Iva deeded to Plaintiffs, did not include the disputed portion. *Gerhart v. Hilsenbeck*, 164 Pa. Super. 85, 88, 63 A.2d 124, 126 (1949) (stating that "[t]he deed, in itself, creates no privity as to land outside its calls"). Although testimony shows that the fence surrounding 22-G Estate Enighed also included the disputed portion of land when Iva purchased 22-G Estate Enighed in 2000, mere possession by Iva of the disputed portion of land, without evidence that Iva acted as only the owner of the disputed portion of land would do, does not establish that such possession was adverse. *Allen v. Williams*, 2021 V.I. SUPER 59U, 2016 WL 11740781, at *4 (V.I. Super. Oct. 18, 2016) (explaining that "[m]ere possession of the true owner's land will be presumed to be with the owner's permission and in subordination to his title and thus not hostile to it"). There is no evidence that Iva

constructed the fence encompassing the disputed portion of land, continuously resided on the fenced-in property from 1980s to his death in 2018, personally performed any acts on the disputed portion of land or in connection with it, or that he was under the mistaken belief that the property that he purchased included the disputed portion of land beyond his title, *Bakery, Inc.*, 15 V.I. at 293 (finding that "Lockhart was under the impression that he was conveying to the plaintiff the fenced-in property and the plaintiff was under the impression that by virtue of the deed she had obtained title to that property" when she took possession, which was sufficient to create privity between the parties). Thus, the Court is not convinced that Plaintiffs' chances of establishing Iva's adverse possession of the disputed portion of land by its inclusion within the fence that surrounded 22-G Estate Enighed are significantly better than negligible. *Mallet*, 16 F.4th at 380.

### *(4) Clemmie's Possession*

Plaintiffs argue that "[t]here is no doubt that tacking is permissible where there has been a parol gift of real property between family members" and, "[a]ccordingly, the period which Clemmie Moses has possessed the property is appropriately tacked onto the possession of her daughters, the Moses Plaintiffs." (ECF No. 35 at 6.) There is no evidence that there has been any parol gift of real property to Clemmie, Iva (since Iva purchased the property), or Plaintiffs (since they obtained property by a written deed). Plaintiffs cannot tack onto Clemmie's possession of the disputed portion of land because there is no privity of possession between Plaintiffs and Clemmie. Clemmie has never held title to 22-G Estate Enighed or the disputed portion of land, and there is no evidence that Clemmie had any adverse possessory interest to transfer to Plaintiffs or that she has done so by some act or deed or operation of law. *Hendricks*, 2016 WL 6427879, at *4 (explaining that "tacking involves the transfer of possession"); *Wolfe v. Porter*, 405 Pa. Super. 385, 389, 592 A.2d 716, 718 (1991) (stating that "[e]ach predecessor must have claimed title to the property in dispute, and in transferring to his successors must have purported to include it"). Plaintiffs also contend that, after Iva's passing in 2018, "the Moses Property has remained continuously occupied by the Moses Plaintiffs' mother, Clemmie Moses." (ECF No. 3 at 9.) Since Melanie testified that Clemmie lives on the Moses property with Plaintiffs' permission,

Clemmie's permissive possession defeats any claim of adverse possession. *Alvarez*, 2020 VI 15, ¶ 12 (finding that permissive possession "cannot be the basis for adverse possession unless" there is notice of hostile claim). In the absence of evidence that Clemmie had any transferable adverse possessory interest in the disputed portion of land and that she transferred such interest to Plaintiffs, the Court is not convinced that Plaintiffs' chance of establishing Clemmie's adverse possession of the disputed portion of land are significantly better than negligible. *Mallet*, 16 F.4th at 380.

The Court finds that Plaintiffs failed to show likelihood of success on the merits of their adverse possession claim.

### B. Irreparable Harm

Concerning irreparable harm, Plaintiffs assert in their motion that their irreparable harm is imminent because Lake "already knocked out their fence, has construction workers on site, and is poised to begin excavating the disputed section of the Moses Property at any time." Plaintiffs argue that "[f]ruit trees that were planted in the Moses Plaintiffs' childhood now stand to be destroyed or permanently damages by Defendant's reckless disregard" and damage to the disputed portion of land, along with the fruit trees and plants, cannot be remedied with monetary damages. According to Plaintiffs, "[t]heir real property is necessarily unique" because it is their "childhood home," "the yard they played in, full of trees they picked the fruit from in the heat of the afternoon, with the view that they remember when they imagine their ancestral home while they reside in Georgia." Plaintiffs explain in a footnote:

> Plaintiffs respectfully request that the Court to take judicial notice of the fact that fruit trees are not interchangeable or inherently replaceable: the fruit from one mango tree is not identical to the fruit from another, just as the volume produced by one guavaberry tree is in no way guaranteed by merely replacing the tree. This fact is generally known in the Virgin Islands, therefore judicial notice is appropriate. Fed. R. Evid. 201(b)(1). On the basis of fruit trees alone, monetary damages are not an adequate or quantifiable remedy for the destruction of the Moses Plaintiffs' land and the improvements thereupon.

Lake argues that the only basis for asserting they will suffer irreparable harm is the sentimental value associated with the trees on the disputed portion of land.

Plaintiffs do not cite any legal authority in support of the proposition that fruit trees on the disputed portion of land make their alleged property rights unique for the purpose of the injunctive relief or explain that proposition, other than to assert that each tree is different from another and the fruit trees represent "the view that they remember when they imagine their ancestral home while they reside in Georgia." Even assuming that judicial notice of the fact that "fruit trees are not interchangeable or inherently replaceable" is appropriate, no evidence was submitted identifying the species, number, age, condition, longevity, growth rate, mature size, maintenance requirements or any other attributes of any fruit trees currently existing on the disputed portion of land that are allegedly at risk of imminent harm. Lake's unrebutted testimony indicates that neither the specific mango tree nor the specific tamarind tree about which witnesses testified are located on the disputed portion of land. Plaintiffs do not allege that Lake destroyed or damaged any trees existing on the disputed portion of land. If any fruit trees exist presently on the disputed portion of land, which is alleged to be "roughly 50 feet, possibly . . . as much as roughly 32 feet with the possible encroachment progressively narrowing to an undisputed point," no evidence was presented to establish what, if anything, prevented Plaintiffs from identifying those trees and their specific numbers and attributes or presenting a photograph of such allegedly threatened trees as they currently exist on the disputed portion of land. While the destruction of trees may support a finding of irreparable harm in certain circumstances, *see Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 204-05 (D.D.C. 2015) (although the harm from removal of approximately 200 trees, most of which are healthy, mature and on the public property, is "somewhat of a close question," the court found irreparable harm because even if replaced by saplings it would take years for them to grow to the size of the current trees); *Concerned Citizens of Chappaqua v. U.S. Dep't of Transp.,* 579 F. Supp. 2d 427, 432 (S.D.N.Y. 2008) (finding that "imminent felling of 61 trees constitutes irreparable harm" where "irreplaceable" and "specimen" trees due to their age, beauty, location, or species were scheduled to be cut down in preparation for the bridge construction project); *Sierra Club v. Block*, 614 F. Supp. 134, 137 (E.D. Tex. 1985) (finding irreparable harm both with and without an injunction because "continued timber cutting will mean the loss of thousands of pine trees in Texas Wilderness

Areas for no valid reason" and, if the government is correct, "a cessation of timber cutting will lead to the proliferation of Southern Pine beetles and the loss of even more thousands of pine trees in the Wilderness Areas"), the circumstances of this case do not warrant such a finding. *See Friends of Pine St. v. Everett*, No. 5:19-CV-95, 2022 WL 2255307, at *3 (D. Vt. June 17, 2022) (finding that "the loss of some trees" does not constitute "an irreparable environmental harm" because 40 years old trees "can be replaced if necessary with new plantings" and, "[i]f the plaintiff prevails in this lawsuit, there will be an opportunity to discuss possible remedies to restore the land to its prior condition."); *All. for the Wild Rockies v. Pena*, No. 2:16-CV-294-RMP, 2016 WL 6123236, at *3 (E.D. Wash. Oct. 19, 2016) (finding that, "despite the fact that certain trees will be permanently removed, logging is not per se an irreparable harm requiring an injunction")

In their supplemental brief, Plaintiffs assert for the first time that "[t]he important consideration is not the value of the trees" but that Plaintiffs will endure "a lack of control over features, fixtures, and equipment located on their property" and damage to the disputed portion of land "along with the fruit trees and plants thereon will irreparably undercut Plaintiffs' ability to make 'productive use of their property,'" which cannot be remedied monetarily. The evidence shows that no family member, including Clemmie, has been recently or is currently planting any vegetables or fruit trees in the disputed portion of land or that Plaintiffs intend to make the productive use of the disputed portion of land by growing vegetables or fruits for sale or personal consumption in the future. Clemmie, who lives on the Moses Property and regularly travels to Georgia for medical treatments, testified that she can no longer plant due to her age and medical condition, and Plaintiffs only visit the Moses Property but reside in Georgia. Plaintiffs failed to explain how any economic loss from harvesting vegetables and fruits, or "a lack of control over features, fixtures, and equipment" that may be presently located on the dispute portion of land constitutes irreparable harm that cannot be remedied with money damages. *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988) (noting that "a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement"). No evidence exists in the record that any fruit trees, to the extent they exist presently in the disputed

portion of land, are unique, valuable, or special in any way other than Plaintiffs' emotional attachment to them. However, despite the emotional value, Clemmie, testified that the mango tree she planted could be replaced, although "it probably would be heartbreaking." Other than arguing that they wish to preserve their fruit trees because they represent their family memories, *i. e.*, "the view they remember when they imagine their ancestral home while they reside in Georgia," Plaintiffs failed to show the unique nature of their alleged property rights. Apart from conclusory assertions, they did not explain why any harm from the alleged imminent damage to any fruit trees to the extent they exist on the disputed portion of land cannot be remedied by monetary relief. *Hynoski v. Columbia Cnty. Redevelopment Auth.*, 485 F. App'x 559, 563 (3d Cir. 2012) (finding that "the taking of real property can be adequately remedied by monetary compensation and that the intangible personal connection to property does not render condemnation an irreparable injury"); *Sargent v. United States*, No. CIV.A.08-3887, 2008 WL 3154761, at *7 (E.D. La. Aug. 5, 2008) ("While plaintiffs and intervenor-plaintiffs understandably place great personal value on their trees and the privacy they provide, the Court is not persuaded that this rises to the level of irreparable harm warranting the issuance of a preliminary injunction. Any injury to these plaintiffs and intervenor-plaintiffs can be compensated with money damages at a later time."). The Court finds that Plaintiffs failed to show that they are "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Mallet & Co.*, 16 F.4th at 380.

## IV. CONCLUSION

Since Plaintiffs failed to establish both "gateway factors," *Amalgamated Transit Union Loc. 85*, 39 F.4th at 103, the Court need not consider the remaining two factors in determining whether a preliminary injunction should issue. *Greater Phila. Chamber of Com.*, 949 F.3d at 133 (stating that "the moving party must establish the first two factors and only if these 'gateway factors' are established does the district court consider the remaining two factors"); *Goadby v. Philadelphia Elec. Co.,* 639 F.2d 117, 122 (3d Cir. 1981) (emphasizing that irreparable harm is "the sine qua non of any preliminary injunction"). Accordingly, the Court will deny Plaintiff's request for preliminary injunction. An appropriate Order follows.

*Moses v. Lake*
Case No. 3:22-cv-0063
Memorandum Opinion
Page **20** of **20**

**Date:** July 14, 2023                                         <u>/s/  Robert A. Molloy    </u>
                                                              **ROBERT A. MOLLOY**
                                                              **Chief Judge**